UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| VALERIE MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| IT'S ALL GOOD AUTO SALES, INC., and | ) | No. |
| MARK GOODFELLOW, individually and | ) | JURY DEMAND |
| d/b/a IT'S ALL GOOD AUTO SALES, | ) | |
| INC., and JIMMY FOLEY, individually | ) | |
| and as an agent of IT'S ALL GOOD AUTO | ) | |
| SALES, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## COMPLAINT

COMES NOW Plaintiff, Valerie Moore, by and through undersigned counsel, and in support of her claim for relief against Defendants It's All Good Auto Sales, Inc., Mark Goodfellow, individually and d/b/a It's All Good Auto Sales, Inc., and Jimmy Foley, individually and as an agent of It's All Good Auto Sales, Inc., and states the following:

## I.  NATURE OF THE CASE

1.  This is an action for damages, arising under the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. Additionally, the action includes claims under the Truth in Lending Act, the Tennessee Consumer Protection Act, and the Tennessee Uniform Commercial Code, as well as fraud, negligent misrepresentation, breach of contract and conspiracy to commit some

or all of the aforementioned torts. All aforementioned acts constitute predatory lending and sales practices and a predatory lending and sales scheme by Defendants.

2. Defendants form an enterprise in a fraudulent scheme to sell low quality over priced used vehicles to poor and working class African American residents of Memphis and in nearby cities and nearby states, through false and misleading advertising, and intentionally misleading acts and omissions in sales and service.

3. Defendants take advantage of the buyer's desperate financial position to impose very unfavorable lending terms, and require that the buyer put down most or all of their savings to purchase an old and typically unreliable vehicle. Defendants' scheme is intended to ultimately deprive buyers of their vehicle so that Defendants can resell it from their lot, at the highest down payment possible, and repeat the process again and again.

## II. JURISDICTION

4. This Action is brought pursuant to the provisions of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq. and TILA, 15 U.S.C. § 1601 et seq. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331, with resulting jurisdiction over Plaintiffs state law claims pursuant to 28 U.S.C. § 1367.

## III. VENUE

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) in that Plaintiff and Defendants reside or do business in this district and/or a substantial part, if

2

not all, of the events or omissions giving rise to the claim occurred in this district.  Venue is also proper in this district pursuant to 18 U.S.C. § 1965(a) in that all parties reside, are found, have an agent, and/or transact his/her/its affairs in this district.

## IV. PARTIES

6. Plaintiff Valerie Moore (hereinafter referred to as "Plaintiff" or "Ms. Moore") is an adult citizen and a resident of Shelby County, Tennessee and currently resides at 845 Lenow Park Dr., #101, Memphis TN 38126.

7. Defendant It's All Good Auto Sales, Inc. (hereinafter "IAG")is a for-profit company, formed and currently operating in Shelby County, Tennessee, in the business of selling used cars to the public.  The principal place of business of It's All Good Auto Sales is 2944 South Third St., Memphis, TN 38109.  The registered agent for It's All Good Auto Sales is Mark T. Goodfellow, 2944 S. Third St., Memphis, TN 38109.

8. Defendant Mark Goodfellow (hereinafter "Mark" or "Mr. Goodfellow") is a resident and citizen of Shelby County Tennessee. Upon information and belief, he is the founder and principal shareholder of It's All Good Auto Sales, Inc. and actively controls the day to day operations of the business.

9. Defendant Jimmy Foley (hereinafter "Jim" or "Mr. Foley") is a resident and citizen of Shelby County Tennessee.  Upon information and belief, he is a general manager and shareholder of It's All Good Auto Sales, Inc. It's All Good

3

Auto Sales, Inc. and is actively involved in the day to day operations of the business.

## V. JURY DEMAND

10. Plaintiff invokes her right to trial by jury as provided for in 42 U.S.C. § 1981a(c)(1) and Rule 38 of the Federal Rules of Civil Procedure.

## VI. STATEMENT OF FACTS

11. Ms. Moore is a 51 year old African American woman who is a resident of Shelby County.

12. On or about September 4, 2010, Ms. Moore went shopping for a car.

13. Ms. Moore spent hours at several dealerships that day looking for a reliable car she could afford. Around 5:00pm or 6:00pm that evening, she went to one final dealership- It's All Good Auto Sales, Inc.

14. Ms. Moore was attracted to the dealership because it is a major used-car dealer in Memphis, it is conveniently located on Third St., in South Memphis, and because of the well known promise made by Mr. Goodfellow himself on numerous television, radio and internet ads that, "I Don't Care About Your Credit. I Care About You."

15. When Ms. Moore arrived at the dealership, she noticed that there were a number of used luxury cars and used sports cars parked on the front of the lot that appeared to be in good condition. A few of these cars had prices marked on them, but the rest of the cars on the lot did not have any visible price tag or

other notices on their windows.

16. A salesman named Steve greeted Ms. Moore at the entrance of the lot, and asked her how much of a down payment she could afford. Ms. Moore told him she had $600 in her pocket for the down payment.

17. Steve showed Ms. Moore several cars. Ms. Moore picked out a 1994 Toyota Camry. She was not permitted to test drive the car on a road- only around the lot. After she finished the test drive, Steve told her that the Camry was $800 down. Ms. Moore told Steve that all she had was $600 at the time.

18. While Ms. Moore and Steve were discussing the down payment, a person appeared from the finance office. The person introduced himself to Ms. Moore as "Jim" (a/k/a Defendant Jimmy Foley). Jim told Ms. Moore that the down payment on that Camry was $1000. Ms. Moore told him that she only had $600. Jim said to her, "We can work something out with you, we can work something out."

19. Jim led Ms. Moore to an office to discuss the purchase of the Camry. Jim then took out a white piece of paper and put it in front of Ms. Moore.  Ms. Moore filled the form with her basic information (name, address, etc.). Jim took the paper to a secretary. He then appeared with the Conditional Sales Security and Federal Truth in Lending Disclosure Statement ("sales contract").

20. Jim presented Ms. Moore with the sales contract. Instead of showing Ms. Moore the "cash down payment" and "deferred down payment" in the numbered lines at the top of the contract, or the 26% stated APR, or the Total Sale Price in the Truth in Lending (TIL) boxes, he drew Ms. Moore's attention *below* the TIL

disclosure boxes with a pen, to a series of numbers and dates added in between the TIL disclosure boxes and the spaces on the form for the regular payments. Jim then told Ms. Moore that her first "quickpay" of $350 would be due on September 7, 2010, the next "quickpay" would be due on the 21st, and the final "quickpay" would be due in October 2010, without ever defining "quickpay" for her.

21. By the time Jim finished pointing out the due dates for the car payments, the store was beginning to close. Ms. Moore was exhausted from shopping for cars all day long. She needed a car to go to the hospital that day to be there for the birth of her great grandchild. She also needed it to get to her doctor's appointments and to take her grandson to school, as well as transport herself around Memphis. Ms. Moore believed that she finally found the car she desperately needed.

22. Jim gave Ms. Moore a pen and instructed her to sign the sales contract at the bottom of the document if she wanted the car. Ms. Moore signed the sales contract in reliance on Jim's statements that that the total amount of the down payment would be $1000, and that the other terms were accurate. Ms. Moore believed that the "quickpay" numbers that Jim pointed to on the sales contract added up to about $1000, which was the amount of down payment she had agreed to pay.

23. Jim gave Ms. Moore a copy of the sales contract after she signed it, and took another copy to a secretary. After about thirty minutes, the secretary gave Ms. Moore the keys and drive-out tags for the vehicle. Ms. Moore drove home,

changed her clothes, and drove to the hospital to visit her new great granddaughter, who was born during the time Ms. Moore spent waiting to purchase the car from IAG.

24. After Ms. Moore returned from the hospital visit, she took another look at the sales contract for the car she just bought from IAG. It appeared on closer inspection, that the total  down payment on the car, according to the sales contract, was $1520, and not the $1000 that Jim had promised. Ms. Moore felt that she had been misled by Jim. She was very upset about this. She could not sleep.

25. The next morning, on September 5th, Ms. Moore awoke and drove to IAG as soon as the dealership opened. Ms. Moore spoke to Jim about the car. She asked him why the car was $1520 down payment instead of the $1000 he promised. Jim claimed that the additional $520 was sales tax. Ms. Moore pointed to line "7", "Sales Tax" in the amount of $518.20, and asked Jim why she was being charged twice.

26. Instead of answering that question, he changed the subject, and began to say something about "quickpay", but he still failed to explain what that term meant, or where it came from.  Ms. Moore was getting upset at that point because it had become apparent to her that he had made intentional misrepresentations about the financing of the car when she bought it, and that he was making further intentional misrepresentations to cover it up.

27. On September 6th, Ms. Moore went back to the dealership to find Defendant Mr. Goodfellow to discuss her car. When Ms. Moore arrived at the dealership, she

found Mr. Goodfellow standing on the lot. Ms. Moore drove up to him, and showed Mr. Goodfellow the sales contract for the car she had bought from the dealership two days earlier. Ms. Moore explained that the amount of the down payment on the sales contract was not the amount Jim had promised. By then, the car had begun making a constant "knocking" noise, which she also pointed out to Mr. Goodfellow. Ms. Moore then asked Mr. Goodfellow to refund the money she paid for the car because of Jim's misrepresentation and the poor condition of the vehicle. Mr. Goodfellow told her that he could not do that, but that she could leave the car on the lot if she didn't want it anymore.

28. Ms. Moore decided to drive the car home that day, even though she believed she had been cheated, because she feared if she did not, she would lose the car and the money she had already put into the car. Ms. Moore had paid $650 down for the car on the day of purchase. She made timely payments on the rest of the "quickpays", in the amount of $870. Because the car continued to have electrical and mechanical problems, she brought it to IAG for repairs. IAG agreed to add the cost of the repairs on top of the total price of the vehicle. Ms. Moore continued to make timely regular payments on the car. She paid IAG $250 on the 5th of each month, from November through January, for total of $750. She had paid a grand total of $2270 of the total price of the car, which was $8830, for the seventeen year old Toyota Camry.

29. Despite the repairs made by IAG, the car continued to have electrical and mechanical problems. Finally, in mid to late November 2010, the car broke down completely. Ms. Moore was in Whitehaven at the time, taking a relative to

a doctor's appointment. When she left the doctor's office, Ms. Moore could not start the car. Thinking that her battery had died, she called her son, and asked him to give her a boost. When that failed to start her car, Ms. Moore called her mechanic, Javier, who was able to start the car again.

30. Ms. Moore left the parking lot of the doctor's office in her car, but it broke down again before she could make it home. She coasted the car to a stop in a parking lot, and walked to an ambulance repair shop that was nearby. She obtained the assistance of three mechanics from the shop, but they could not get the car to start up again. Ms. Moore then called her son, who pushed her vehicle with his car.

31. When Ms. Moore finally got home that day, she called IAG. Ms. Moore asked to speak with Mr. Goodfellow. She told Mr. Goodfellow that her car had become inoperable. Mr. Goodfellow told her to fix the car. Ms. Moore told him that she could not afford to spend money up front to fix the car. Mr. Goodfellow suggested that she bring the car to his dealership. Ms. Moore asked him how she was going to do that if car was not running. Mr. Goodfellow asked her to tow the car to his dealership. She said she could not afford it. Mr. Goodfellow eventually offered to send a tow truck. The tow truck picked up the car later that day.

32. After her car was towed to the dealership, Ms. Moore called Mr. Goodfellow and asked him when the dealership would finish working on her car. Mr. Goodfellow said he didn't know. He said he had to get hundreds of other cars ready for "tax time".

9

33. Based on Mr. Goodfellow's statement about getting the other cars ready for "tax time", Ms. Moore believed that he had no intention of making repairs to the car anytime soon. Ms. Moore had been lied to during and after the sale of the car by IAG, and now the car didn't even work. It had become clear to Ms. Moore that Mr. Goodfellow did not care about her- only her money.

34. Ms. Moore contacted Memphis Area Legal Services, Inc. (hereinafter "MALS") the next day to seek legal assistance regarding the transaction with IAG.  MALS prepared a revocation/rescission letter for Ms. Moore.

35. On or about January 2011, Ms. Moore returned to the lot to drop off the keys to the car, deliver the letter, and retrieve her personal belongings from the car. The car was located in a remote lot- nowhere near the dealership's repair shop. It did not appear that Mr. Goodfellow had any intention of repairing the vehicle.

36. In February 2011, Ms. Moore received a notice from IAG that the car was being sold at a public sale.

## VII. CAUSES OF ACTION

## COUNT I

## VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C.§ 1961 et seq. - ALL DEFENDANTS

37. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint and allege that all Defendants, engaged in a predatory lending and sales scheme and in an organized effort to sell low quality over priced used vehicles to poor and working class African American residents of Memphis and cities in nearby states through false and misleading advertising, and intentionally misleading acts and omissions in sales and service. Defendants take advantage of the buyer's desperate financial position to impose very unfavorable lending terms, and require that the buyer put down most or all of their savings to purchase an old and typically unreliable vehicle. Defendants' scheme is intended to ultimately deprive buyers of their vehicle so that Defendants' can resell it from their lot, at the highest down payment possible, and repeat the process again. All Defendants used wire, radio, or television communication in interstate or foreign commerce, as well as writings, signs, signals pictures, or sounds in furtherance of their actions as set forth above, and all Defendants engaged in a pattern of racketeering activity as defined in 18 U.S.C. §§ 1961-1968.

38. Defendants, all of which are persons within the meaning of RICO, are employed by or associated with an enterprise whose activities engage in or affect interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C.§ 1962(c); to wit, multiple violations of 18 U.S.C. § 1343.

11

39. The members of the group have the same or similar purposes, results, participants, victims, methods of commission and are interrelated by distinguishing characteristics and are not isolated events.

40. All Defendants violated 18 U.S.C. § 1343 multiple times, having devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds, for the purpose of executing such scheme or artifice.

41. The multiple violations of 18 U.S.C. §1343 constitute racketeering activity pursuant to 18 U.S.C. § 1961 and were integral part of and essential to the success of the Predatory Lending and Sales Scheme.

42. All Defendants knew the Predatory Lending and Sales Scheme could not have succeeded and/or continued without the use of extensive advertisements through wire, internet, radio, television, and pictures in interstate or foreign commerce for the purpose of transmitting misleading and fraudulent information to prospective customers such as Plaintiff.

43. The facts demonstrate that Defendants formed an association-in-fact.

44. The associated persons formed an ongoing organization, formal or informal, concerning the RICO Enterprise, and the various associates functioned as a continuing unit of the RICO Enterprise, and the RICO Enterprise exists separate and apart from the predicate activities themselves. The facts in the case demonstrate the existence of an association-in-fact RICO Enterprise by showing

that the enterprise has a certain amount of organizational structure or some sort of chain of command.

45. Defendants Mr. Goodfellow and Mr. Foley, acting as agents for IAG are at the heart of the RICO Enterprise. Their role as facilitators is crucial to the success of the enterprise. The scheme begins with television, radio and internet advertising for IAG that is targeted at poor and working class African Americans who live in Memphis, West Memphis, and other nearby cities in Tennessee, Arkansas and Mississippi. Although advertisements are used year around, advertisement is intensified at the beginning of the year, at the time most of the targeted customers get their tax returns.

46. When the customers arrive at IAG, they are greeted by a salesperson. The cars in the front of the lot are usually a used sports or luxury car. These vehicles are intended to get the interest of the customer. These vehicles have prices posted on them, which are generally outside the price range of most customers.

47. The first thing that the salesman asks the customer is either how much cash the customer has in his or her pocket, or how much of a down payment can he or she make that day. The salesman then brings the customer further back in the lot to a vast selection of low quality used cars. The cars have an inventory number painted on the front wind shield, but do not have a price listed on them, nor do the cars have the necessary Buyer's Guide or any other paperwork posted on the outside window.

48. Once the customer picks out a car, the salesman may or may not allow the customer to test drive the car. The salesman will then tell the customer that he

or she must make a down payment in a certain amount. Whether or not the customer and salesman agree on a down payment, the salesperson will direct the customer to a building on the IAG property where the car is financed. The salesman will then hand over the customer to a person to finance the vehicle. The finance person is either Mr. Goodfellow or Mr. Foley.

49. The finance person often quotes a down payment for the car that is different, and higher, than the amount the customer believed he or she had negotiated with the salesman. If the customer and the finance person agree on a down payment, the customer will be asked to fill out a sheet of paper with some basic information, then the customer will be presented with a pre-filled out sales contract. The finance person will then use one of several techniques to distract the customer from the high interest rate, actual down payment, total price, and the Truth in Lending boxes in general. The finance person will instead draw the customer's attention to the due date for the payments, without explaining anything about the payments. Because the vehicle is often financed with multiple "quickpays," there are multiple sets of installment payments, which are often less than a month from the date of purchase.  This is designed to ensure that the customer will default.

50. After the customer signs the paperwork, and hands over all the cash in his or her pocket, the customer believes that he or she has a reliable car, and the RICO Enterprise of IAG, Mr. Goodfellow, Mr. Foley, the salesperson, as well as other agents of IAG, have already made a profit on the old, poor quality vehicle sold to the customer. The customer has also been setup for the second part of the

14

scheme. Having already spent all the money in his or her pocket for the car upfront, the customer is likely to have difficulty making the first payment or subsequent payments for the remainder of the down payment. If the customer misses that payment, or any payment, a tow truck is quickly sent to repossess the vehicle. Because the customer cannot afford to redeem the vehicle, the RICO Enterprise will get the vehicle back quickly, so that it can turn it around and begin the process again.

51. If the customer does manage to make payments on the car, the trap is sprung when the car inevitably breaks down. The customer cannot afford to make payments on the car and repair it at the same time, so he or she either asks the IAG to repair it, or misses a payment trying to get the car to run. Either way, the RICO Enterprise is for Defendants to get the car back, so that it can be sold again, regardless of it mechanical condition. The same fifteen to twenty year old car could be sold and re-sold every month of the year, raking in significant profits for the RICO Enterprise.

52. By reason of the aforesaid violations of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), Defendants are liable to Plaintiff for actual and treble damages, as well as for costs and attorney's fees.

**COUNT II**

**VIOLATIONS OF THE TRUTH IN LENDING ACT**

53. The Plaintiff incorporates by reference the preceding paragraphs of this Complaint and alleges that all Defendants have violated the provisions of Truth-

In-Lending Act, 15 U.S.C. § 1601, et seq., and Regulation Z which implements the Truth-In-Lending Act, 12 C.F.R. § 226, et seq. (TILA):

a.   By failing to make required disclosures clearly and conspicuously in writing in violation of 15 U.S.C. § 1632(a) and Regulation Z § 226.17(a). Defendants misdirected Plaintiff's attention away from the mandatory TIL disclosures, and the other lines regarding the actual down payment and deferred down payment on the sales contract to the "quickpay" schedule that was added as an alteration to the original form.

b.   By failing to disclose the correct APR on the sales contract in violation of 15 U.S.C. § 1606 (c) and Regulation Z § 226.22 (a)(2).  The APR disclosed on the sales contract in 26.000%.  However, using a payment calculator, the APR comes out to 27.961%.  The difference is more than the 1/8 of one percent (.125%) allowed by the statute.  Further, the difference is a purposeful understatement by Defendants, not a good faith mathematical error by Defendant.

54. By reason of the aforesaid violations of the Act and Regulation Z, Defendants are liable to Plaintiff in the amount of twice the finance charge, actual damages to be established at trial, and attorney's fees and costs in accordance with 15 U.S.C. § 1640.

**COUNT III**

**FRAUD**

55. The Plaintiff incorporates by reference the preceding paragraphs of this Complaint and alleges that all Defendants engaged in a fraudulent scheme to

sell low quality over priced used vehicles to poor and working class African American residents of Memphis in cities in nearby states through false and misleading advertising, and intentionally misleading acts and omissions in sales and service.

56. The above-described acts of Defendants constitute intentional misrepresentations by the Defendants of material facts, including, but not limited to the following:

a.  Defendants' television, radio and internet ads featuring Mark Goodfellow's trademarked phrase, "I Don't Care About Your Credit. I Care About You."

b.  The lack of a Buyer's Guide (per FTC Used Car Rule, 16 CFR Part 455) or any pricing information on most if not all vehicles on the lot, including the car the Plaintiff purchased;

c.  The bait-and switch tactic used by Defendant to obtain a higher down-payment from Plaintiff in the sales contract;

d.   The Defendants' misdirection of Plaintiff's attention away from the mandatory TIL disclosures, and the other lines regarding the actual down payment and deferred down payment on the sales contract to the "quickpay" schedule that was added in outside the disclosure boxes;

e.   The Defendants' attempt to conceal the actual down payment amount, by first misrepresenting the amount and then claiming to Plaintiff, when the misrepresentation was detected, that the $520 added to the agreed $1000 down payment was sales tax; and

f.  Defendants' promise to make repairs to the vehicle after towing it the dealership.

17

57. Defendants made the above-described misrepresentations with full knowledge of their falsity, without belief in their truth, or with reckless disregard of the truth.

58. Plaintiff reasonably relied on the above-described misrepresentations of material facts by Defendants.

59. Plaintiff suffered damages, great mental anguish, and emotional distress as a result of the above-described misrepresentations of material facts by Defendants.

60. Defendants are liable for actual, compensatory, and punitive damages.

**COUNT IV**

**VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT**

61. The Plaintiff incorporates by reference the preceding paragraphs of this Complaint and alleges that Defendants violated Tennessee Consumer Protection Act by engaging in unfair and deceptive acts and practices in the course of selling a car to the Plaintiff.

62. IAG is a "person" as defined by the Tennessee Consumer Protection Act, T.C.A. §47-18-103(9).

63. Mr. Goodfellow is a "person" as defined by the Tennessee Consumer Protection Act, T.C.A. §47-18-103(9).

64. Mr. Foley is a "person" as defined by the Tennessee Consumer Protection Act, T.C.A. §47-18-103(9).

65. Defendants violated the Tennessee Consumer Protection Act, T.C.A. §47-18-101 et seq. (hereinafter referred to as"TCPA") by engaging in the representations and omissions described in the above paragraphs of this Complaint. These representations and omissions constitute unfair and/or deceptive acts and/or practices which affect trade or commerce within Tennessee in violation of the TCPA, T.C.A. §47-18-104(b), and include but are not limited to:

a.   Defendants' television, radio and internet ads featuring Mark Goodfellow's trademarked phrase, "I Don't Care About Your Credit. I Care About You."

b.   The lack of a Buyer's Guide (per FTC Used Car Rule, 16 CFR Part 455) or any pricing information on most if not all vehicle on the lot, including the car the Plaintiff purchased;

c.   The bait-and switch tactic used by Defendants to obtain a higher down-payment from Plaintiff in the sales contract;

d.   The Defendants' misdirection of Plaintiff's attention away from the mandatory TIL disclosures, and the other lines regarding the actual down payment and deferred down payment on the sales contract to the "quickpay" schedule that was added in outside the disclosure boxes;

e.   The Defendants' attempt to conceal the actual down payment amount, by first misrepresenting the amount and then claiming to Plaintiff, when the misrepresentation was detected, that the $520 added to the agreed $1000 down payment was sales tax; and

f.   Defendants' promise to make repairs to the vehicle after towing it the dealership.

19

66. These representations and omissions constitute unfair and/or deceptive acts and/or practices which affect trade or commerce within Tennessee in violation of the TCPA, T.C.A. § 47-18-104(b).

67. As a result of all Defendants' violation of the TCPA, it is liable to Plaintiff for all actual damages, as well as attorney's fees and costs pursuant to TCPA, T.C.A. § 47-18-109(e)(1).

68. In addition, to the extent any and all Defendants' violations were intentional (as opposed to merely negligent), the actual damages to Plaintiff should be trebled pursuant to the TCPA, T.C.A. § 47-18-109(a)(3).

## COUNT V

## NEGLIGENT MISREPRESENTATION

69. The Plaintiff incorporates by reference the preceding paragraphs of this Complaint and alleges that all Defendants made negligent misrepresentations to Plaintiff in the course of selling the car, including but not limited to:

a. Defendants' television, radio and internet ads featuring Mark Goodfellow's trademarked phrase, "I Don't Care About Your Credit. I Care About You."

b. The lack of a Buyer's Guide (per FTC Used Car Rule, 16 CFR Part 455) or any pricing information on most if not all vehicle on the lot, including the car the Plaintiff purchased;

c. The bait-and switch tactic used by Defendants to obtain a higher down-payment from Plaintiff in the sales contract;

d.  The Defendants' misdirection of Plaintiff's attention away from the mandatory TIL disclosures, and the other lines regarding the actual down payment and

20

deferred down payment on the sales contract to the "quickpay" schedule that was

added in outside the disclosure boxes;

e.  The Defendants' attempt to conceal the actual down payment amount, by first

misrepresenting the amount and then claiming to Plaintiff, when the

misrepresentation was detected, that the $520 added to the agreed $1000 down

payment was sales tax; and

f.  Defendants' promise to make repairs to the vehicle after towing it the dealership.

70. Defendants did not exercise reasonable care in obtaining or communicating the

above-described false information to Plaintiff.

71. Plaintiff justifiably relied on the above-described false information supplied by

Defendants.

72. Plaintiff suffered damages as a result of the above-described false information

by Defendants.

73. Defendant is liable for actual and compensatory damages.


**COUNT VI**

**VIOLATION OF THE TENNESSEE UNIFORM COMMERCIAL CODE**

Breach of Implied Warranties of Fitness and/or Merchantability

74. The Plaintiff incorporates by reference the preceding paragraphs of this

Complaint and alleges that Defendants breached the implied warranties of

fitness and/or merchantability in the sale of the car to Plaintiff, entitling Plaintiff

to reject and/or revoke her purchase of the car.

75. A warranty that the Plaintiff's car was fit for the particular purposes of

transporting the Plaintiff and her passengers to doctor's appointments, school,

and on other necessary errands in Memphis was implied by law in the instant transaction, pursuant to T.C.A. § 47-2-315.

76. Plaintiff put Defendants on notice within three days after purchasing the car that it was having mechanical problems, and asked to return the vehicle and get a refund. When Defendants refused, Plaintiff attempted to repair those mechanical problems. Several weeks later the car became inoperable.

77. Because the car Defendant sold to Plaintiff could not fulfill the implied purposes, Defendants were in breach of the warranties of fitness for the particular purposes and/or merchantability.

78. As a result, Plaintiff is entitled to recover actual and consequential damages.

Rejection and/or Revocation of Acceptance

79. The Plaintiff incorporates by reference the preceding paragraphs of this Complaint and alleges that the value of the Plaintiff's car was substantially impaired by defects that existed prior to the purchase of the vehicle and that Plaintiff lost faith in the transaction because of the misrepresentations of Defendants.

80. Ms. Moore notified Defendants about those defects and her loss of faith in the transaction as soon as she became aware of them.

81. Ms. Moore accepted the car from the Defendants without knowledge of the defects, which were not detectable by an ordinary layperson, and without knowledge of the falsity of the misrepresentations.

82. The defects were not seasonably, if ever, cured by Defendants.

83. The defects rendered the car inoperable within weeks of the purchase.

84. Plaintiff rightfully and effectively rejected and/or revoked her acceptance of the car she bought from Defendants three days after the purchase.

85. As a result, Plaintiff is entitled to recover actual and consequential damages.

## COUNT VII

**BREACH OF CONTRACT**

86. Plaintiff incorporates by reference the preceding paragraphs of this Complaint and alleges that Defendants had a contractual relationship with the Plaintiff, either directly or implicitly; Defendants, either directly or through agents, breached such contracts with Plaintiff; and that the breaching of such contracts by Defendants was the proximate cause of damages suffered by Plaintiff.

87. As a result, Plaintiff is entitled to recover actual and consequential damages.

**WHEREFORE**, Plaintiff respectfully prays that this Court:

1.  Assume Jurisdiction of this case;

2.  Empanel a jury to hear the issues in this case pursuant to Rule 38 of the Federal Rules of Civil Procedure and 42 U.S.C.§ 1981a (c)(1);

3.  Award to Plaintiff actual and treble damages to be established at trial pursuant to Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c);

4.  Award to Plaintiff costs and attorney fees pursuant to RICO, 18 U.S.C. § 1964(c);

5.  Award to Plaintiff statutory damages in the amount of twice the finance charge in accordance with 15 U.S.C. § 1640(a)(2);

6.     Award to Plaintiff actual damages to be established at trial in accordance with 15 U.S.C. § 1640(a)(1);

7.     Award to Plaintiff costs and attorney fees in accordance with 15 U.S.C. § 1640(a)(4);

8.     Award to Plaintiff actual, compensatory, and punitive damages to be established at trial for fraud;

9.     Award to Plaintiff actual and treble damages to be established at trial for violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, et seq.;

10.    Award to Plaintiff costs and reasonable attorney fees pursuant to Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-109(e)(1);

11.    Award to Plaintiff actual and compensatory damages to be established at trial for negligent misrepresentation;

12.    Award to Plaintiff damages for violations of the Tennessee Uniform Commercial Code, for an amount to be proven at trial;

13.    Award to Plaintiff damages for breach of contract for an amount to be proven at trial;

14.    For a judgment against Defendants for compensatory damages in an amount to be proven at trial;

15.    Award to Plaintiff such other relief to which Plaintiff is entitled and that is deemed appropriate by the Court.

Dated: September 2, 2011.

Respectfully submitted,


*s/* Craig Barnes____
Craig Barnes, BPR # 25121
Attorney for Plaintiff
Memphis Area Legal Services, Inc.
109 North Main, Ste. 200
Memphis, TN 38103
(901) 523-8822