# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

VALERIE MOORE,

      **Plaintiff,**

v.                                          Case 2:11-cv-02758-STA-cga

IT'S ALL GOOD AUTO SALES, INC. and
MARK GOODFELLOW, individually and
d/b/a IT'S ALL GOOD AUTO SALES,
INC., and JIMMY FOLEY, individually
and as an agent of IT'S ALL GOOD AUTO
SALES, INC.,

      **Defendants.**

---

## REPORT AND RECOMMENDATION OF DEFENDANTS' MARK GOODFELLOW AND IT'S ALL GOOD AUTO SALES, INC.'S MOTION TO DISMISS

---

Before the Court is Defendants Mark Goodfellow ("Goodfellow") and It's All Good Auto Sales, Inc.'s ("IAG") (collectively "Defendants") Motion to Dismiss. (Docket Entry "D.E." #11). The instant motion was referred to United States Magistrate Judge Charmiane G. Claxton for Report and Recommendation. (D.E. #17). For the reasons set forth herein, the court RECOMMENDS that Goodfellow and IAG's Motion to Dismiss be GRANTED in part and DENIED in part.

## I. Procedural Background

On September 2, 2011, Plaintiff Valerie Moore ("Moore") filed a Complaint for damages, alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO"), the Truth in Lending Act, 15 U.S.C. § 1601, *et seq*. ("TILA") and Regulation Z (which implements TILA), 12 C.F.R. § 226, *et seq*., fraud, the Tennessee

Consumer Protection Act, T.C.A. §47-18-101, *et seq.* ("TCPA"), negligent misrepresentation, the Tennessee Uniform Commercial Code, and breach of contract. (Plaintiff's Complaint, "Pl.'s Compl.," ¶¶ 37-87). On November 9, 2011, Defendants IAG and Goodfellow filed the instant Motion to Dismiss for lack of subject-matter jurisdiction and/or failure to state a claim upon which relief may be granted. (D.E. #11).

## II. Proposed Findings of Fact

On or about September 4, 2010, Moore, an African-American female who resides in Shelby Country, Tennessee, went to IAG in search of a reliable and affordable vehicle to purchase. (Pl.'s Compl. ¶¶ 6, 12, 13). Moore was attracted to IAG because it is a "major used-car dealership in Memphis" with a convenient location. (Pl.'s Compl. ¶ 14). Moore was also attracted by the numerous television, radio, and internet advertisements featuring Goodfellow, IAG's founder and principal shareholder, promising, "I Don't Care About Your Credit. I Care About You." (Pl.'s Compl. ¶¶ 8, 12-13). Upon arriving at IAG, Moore observed a number of used luxury and sports cars parked at the front of the lot with prices marked on them that appeared to be in good condition. (Pl.'s Compl. ¶ 15). Moore also noticed that the rest of the vehicles on IAG's lot did not appear to have visible price tags or other notices on their windows. Id.

A salesman greeted Moore at the entrance of IAG's lot, inquiring as to the amount of a down payment Moore could afford to purchase a vehicle, and she informed him she had "$600 in her pocket for the down payment." (Pl.'s Compl. ¶ 16). The salesman proceeded to show Moore several cars. (Pl.'s Compl. ¶ 17). Moore selected a 1994 Toyota Camry that she was permitted to test drive around the IAG lot but not on a road. Id. After the test drive, Moore was informed that the Camry she selected required a down payment of $800, and Moore reiterated that she

only had $600.  Id.  During these discussion regarding the down payment, Moore was greeted by Jimmy Foley ("Foley"), General Manager and shareholder at IAG, who told Moore that the Camry required a $1000 down payment.  (Pl.'s Compl. ¶¶ 9, 18).  Moore informed Foley that she could not afford a $1000 down payment, but she was told by Foley that "we can work something out," and she went with him into his office.  (Pl.'s Compl. ¶ 18).

After Moore completed a form with her basic personal information, Foley presented Moore with a contract for the sale of the Camry.  (Pl.'s Compl. ¶ 20).  Foley drew Moore's attention to a series of numbers (the "quickpay"), overlooking the cash down payment, deferred down payment, the annual percentage rate ("APR"), and truth-in-lending boxes at the top of the contract.  Id.  Without defining the "quickpay" system, Foley informed her that her first "quickpay" of $350 would be due September 7, 2010, that the next "quickpay" would be due on September 21, 2010, and the final "quickpay" would be due in October, 2010.  Id.  It was Moore's understanding that the three "quickpay" payments were the $1000 down payment she agreed to pay. (Pl.'s Compl. ¶ 22).

At this time, the dealership was beginning to close, and she needed to leave as her great-grandchild had been born while she was attempting to purchase her vehicle.  (Pl.'s Compl. ¶¶ 21, 23).  Moore said that she was "exhausted" from car shopping and needed the vehicle for doctor's appointments, taking her grandson to school, and transporting herself around Memphis.  (Pl.'s Compl. ¶ 21).  Moore signed the sales contract at the bottom of the document in reliance upon Foley's statements that the down payment was $1000.  Id.  Moore was given a copy of the sales contract after she signed it, and she left IAG's lot with her new vehicle approximately thirty minutes later.  (Pl.'s Compl. ¶ 23).  An additional copy of the sales contract was retained by IAG.  Id.  Later that evening, after Moore returned home from visiting her great-grandchild, she

took "another look" at the sale contract and realized, upon "closer inspection," that the total of the "quickpay" payments was $1520, not $1000. (Pl.'s Compl. ¶ 24).

The next morning, September 5, 2010, Moore returned to IAG as soon as the dealership opened for business to inquire about the higher price. (Pl.'s Compl. ¶ 25). Foley told Moore that the higher price represented $520 in sales tax. Id. Moore pointed to the seventh line of the sales contract, which listed "Sales Tax" in the amount of $518.20, and inquired as to why she was being charged twice. Id. Instead of answering her question, Foley began to talk about the "quickpay" process, again without explaining this term. Id. Moore became frustrated and felt that he had been dishonest during the purchase of the vehicle and was continuing to be dishonest to "cover it up." (Pl.'s Compl. ¶ 26).

Moore returned to IAG the following day, September 6, 2010. (Pl.'s Compl. ¶ 27). On this date, Moore spoke with Goodfellow about the price discrepancy as well as about a constant "knocking" noise the car had begun making. (Pl.'s Compl. ¶ 27). Moore asked Goodfellow for a refund due to the misrepresentation and "poor condition" of the vehicle; she was told that she could not have a refund but she could leave the car on IAG's lot if she did not want it anymore. Id. Moore still "believed that she had been cheated" but chose to keep the vehicle because she did not want to lose the $650 she paid as a down payment. (Pl.'s Compl. ¶ 28). Moore made the "quickpay" payments in the amount of $870 and made three regular payments of $250 per month. Id. In total, Moore paid $2270 of the total price of $8830. (Pl.'s Compl. ¶ 28).

The vehicle continued to have electrical and mechanical problems, and the vehicle broke down completely in November, 2010. (Pl.'s Compl. ¶¶ 29-30). Moore took her vehicle to a repair shop, but three mechanics were unable to get the car to start. (Pl.'s Compl. ¶ 30). Moore called IAG and spoke with Goodfellow, informing him that her vehicle had become inoperable.

(Pl.'s Compl. ¶ 31). Goodfellow initially "told her to fix the car," but Moore stated that she could not afford to do so. Id. Goodfellow then suggested that she bring the car to his dealership. Id. Moore stated that she could not do so because it was not running, and he asked her to tow it to his dealership. Id. She again reiterated that she could not afford to do so. Id. Ultimately, Goodfellow arranged for Moore's vehicle to be towed to IAG. Id.

After the vehicle was towed, Moore called Goodfellow and asked when her car would be ready. (Pl.'s Compl. ¶ 32). Goodfellow told Moore that he did not know and that he had "hundreds" of other vehicles to be worked on as well for "tax time." Id. Based on this conversation, Moore believed Goodfellow had no intention of repairing her vehicle anytime soon. (Pl.'s Compl. ¶ 33). Moore continued to believe that she had been "lied to during and after the sale of the car" and contacted an attorney, who prepared a revocation/rescission letter for her. (Pl.'s Compl. ¶ 34). In January, 2011, Moore returned to IAG to deliver the letter, drop off the keys to the vehicle, and retrieve her personal belongings from it. (Pl.'s Compl. ¶ 35). She found that her vehicle was located on a remote lot nowhere near IAG's repair shop, which further confirmed her concern that Goodfellow did not have "any intention of repairing the vehicle." (Pl.'s Compl. ¶ 35). In February, 2011, Moore received notice from IAG that her vehicle would be sold at a public sale. (Pl.'s Compl. ¶ 36).

## III. Legal Standard

A Rule 12(b)(1) motion attacks a complaint for lack of jurisdiction over the subject matter. Such a motion requires that the court accept the non-moving party's allegations of facts as true. DLX, Inc. v. Kentucky, 381 F.3d 511, 516 (6th Cir. 2004). Where subject matter is challenged, the party asserting jurisdiction bears the burden of establishing jurisdiction. Moir v. Greater Cleveland Regional Transit Auth., 895 F.2d 266, 269 (6th Cir. 1990). Further, "the

plaintiff, as the party invoking federal subject matter jurisdiction, has the burden of persuading the court that all of the requirements necessary to establish standing to bring the lawsuit have been met." Courtney v. Smith, 297 F.3d 455, 459 (6th Cir. 2002).

A Rule 12(b)(6) motion challenges a complaint for failure to state a claim upon which relief may be granted. This motion only tests whether the plaintiff has pleaded a cognizable claim. Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988). Essentially, it allows the court to dismiss, on the basis of a dispositive issue of law, meritless cases which would otherwise waste judicial resources and result in unnecessary discovery. See, e.g., Nietzke v. Williams, 490 U.S. 319, 326-27 (1989). To determine whether a motion to dismiss should be granted, the court must examine the complaint. The complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief, Fed. R. Civ. P. 8(a)(2), and it must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests. Conley v. Gibson, 355 U.S. 41, 47 (1957); Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir. 1976). While a complaint need not present detailed factual allegations, to be cognizable it must provide more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1959 (2007); see also Scheid, 859 F.2d at 436-37. A complaint must have a factual foundation, and the mere possibility that a plaintiff might later establish some set of undisclosed facts to support recovery is insufficient to survive a 12(b)(6) challenge. Twombly, 127 S.Ct. at 1968. In reviewing the complaint, the court must accept as true all factual allegations in the complaint and construe them in the light most favorable to the plaintiff. Nietzke, 490 U.S. at 326-27; Windsor v. The Tennessean, 719 F.2d 155, 158 (6th Cir. 1983). However, only well-pleaded facts must be taken as true, and the court need not accept legal conclusions or

unwarranted factual inferences.  <u>Lewis v. ACB Bus. Servs., Inc.</u>, 135 F.3d 389, 405-06 (6th Cir. 1998).  When a complaint does adequately state a claim, it may not be dismissed based on the court's assessment that the party will "fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder."  <u>Twombly</u>, 127 S.Ct. at 1969.

Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The Sixth Circuit has read the Rule 9(b) requirement in a liberal manner, requiring a plaintiff to, at a minimum, "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."  <u>Advocacy Org. for Patients and Providers</u>, 176 F.3d at 322 (quoting <u>Coffey v. Foamex L.P.</u>, 2 F.3d 157, 161-62 (6th Cir. 1993)).

## IV.  Proposed Conclusions of Law

### A.  The Racketeer Influenced and Corrupt Organizations Act (RICO)

Defendants allege that Moore has failed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to state a claim upon which relief may be granted under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  RICO prohibits any person employed by or associated with any enterprise affecting interstate commerce to conduct or participate in the enterprise's affairs "through a pattern of racketeering activity." 18 U.S.C. § 1962(c).  The purpose of the RICO statute is to combat "organized and/or continuing patterns of criminal activity," and the statute should be read liberally in order to effectuate this purpose.  <u>United States v. Qaoud</u>, 777 F.2d 1105, 1115 (6th Cir. 1985).  In order to prove a RICO violation, a plaintiff must establish: 1) two or more predicate offenses; 2) the existence of an enterprise; 3) a pattern of racketeering activity that bears a sufficient nexus to the enterprise; and 4) an injury to

the plaintiff's business or property as a result of the first three elements. VanDenBroeck v. CommonPoint Mortg. Co., 210 F.3d 696, 699 (6th Cir. 2000).

### 1. *Predicate Offenses*

The first required element of a RICO claim is the presence of two or more predicate offenses. VanDenBroeck, 210 F.3d at 699. "Mail and wire fraud may constitute 'predicate acts' within the meaning of the RICO statute." Melton v. Bank of Lexington, 02-1152B, 2009 WL 2971806 (W.D. Tenn. 2009). Allegations of mail and wire fraud require a showing of "(1) a scheme to defraud, and (2) use of the mails, or of an interstate electronic communication, respectively, in furtherance of the scheme." Advocacy Org. for Patients and Providers v. Auto Club Ins. Ass'n, 176 F.3d 315, 322 (6th Cir. 1999) (citing United States v. Brown, 147 F.3d 477, 483 (6th Cir. 1998)). It is not necessary for a plaintiff to show actual reliance when alleging mail or wire fraud. United States v. Daniel, 329 F.3d 480, 486 (6th Cir. 2003) (citing Nader v. U.S., 527 U.S. 1, 25 (1999)). In establishing a scheme to defraud by wire, wire communication must "be employed 'for the purpose of executing such scheme or artifice.'" Daniel, 329 F.3d at 489 (quoting 18 U.S.C. § 1343). With respect to this element, IAG and Goodfellow argue not only that Moore's Complaint fails to state a claim upon which relief may be granted under Rule 12(b)(6), but further argue that Moore's Complaint does not properly plead the scheme to defraud with particularity as required by Rule 9(b).

Upon review, Moore alleges that IAG and Goodfellow devised a scheme to defraud by selling low quality, over-priced used vehicles to poor and working class African-American residents of Memphis, Tennessee and its surrounding areas through false and misleading advertising and intentionally misleading acts and omissions in sales and service. (Pl.'s Compl. ¶¶ 37, 55). In furtherance of this scheme, Moore alleges that IAG and Goodfellow used television,

radio, and internet advertisements featuring Goodfellow's trademarked phrase, "I Don't Care About Your Credit. I Care About You." (Pl.'s Compl. ¶¶ 14, 56a). Moore alleges that the use of these advertisements violates 18 U.S.C. § 1343 (fraud by wire, radio, or television) and satisfies the requirement of predicate acts in a RICO claim.

In addition, Moore specifically alleges that Defendants' scheme to defraud intended to "take advantage of the buyer's desperate financial position to impose very unfavorable lending terms, and require that the buyer put down most or all of their savings to purchase an old and typically unreliable vehicle." (Pl.'s Compl. ¶ 37). Moore alleges that the goal of the scheme is "to ultimately deprive buyers of their vehicle so that Defendants' [sic] can resell it from their lot, at the highest down payment possible, and repeat the process again." Id. Again, Moore reiterates the necessity of the advertisements in perpetuating the alleged fraud:

> [a]ll Defendants knew the Predatory Lending and Sales Scheme could not have succeeded and/or continued without the use of extensive advertisements through wire, internet, radio, television, and pictures in interstate or foreign commerce for the purpose of transmitting misleading and fraudulent information to prospective customers such as Plaintiff.

(Pl.'s Compl. ¶ 42). Further, Moore claims that these advertisements "were [an] integral part of and essential to the success of the Predatory Lending and Sales Scheme." (Pl.'s Compl. ¶ 41).

Moore also specifically describes her injuries as a result of the Defendants' alleged actions. Specifically, she made a total of $2270 in payments for a vehicle that became inoperable approximately two months after she purchased it, the Defendants did not repair the vehicle, and the vehicle was eventually set to be sold at a public sale. (Pl.'s Compl. ¶¶ 28, 29, 33, 36). The Court recommends that the specificity of Moore's allegations regarding the predicate offenses satisfies Rule 12(b)(6) and the heightened pleading standards required by Rule 9(b).

## 2. *Existence of Enterprise*

The second required element of a RICO claim is the existence of an enterprise. VanDenBroeck, 210 F.3d at 699. "Enterprise" has been defined as "a group of persons associated together for a common purpose of engaging in a course of conduct." U.S. v. Turkette, 452 U.S. 576, 580 (1981). An enterprise can be a legal entity or "any union or group of individuals associated in fact although not a legal entity." Id. at 582 (quoting 18 U.S.C. § 1961(4)). In order to prove the existence of an association-in-fact enterprise, it must be shown "1) that the associated persons formed an ongoing organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity in which it engaged." VanDenBroeck, 210 F.3d at 699.

In order to establish that an association-in-fact operated as a "continuing unit," the plaintiff must allege "facts suggesting that the behavior of the listed entities is 'coordinated' in such a way that they function as a 'continuing unit.'" Begala v. PNC Bank, Ohio, Nat. Ass'n, 214 F. 3d 776, 782 (6th Cir. 2000) (citing Frank v. D'Ambrosi, 4 F.3d 1378, 1386 (6th Cir. 1993)). "All that is required is some minimal level of organizational structure between the entities involved." VanDenBroeck, 210 F.3d at 699. Additionally, an association-in-fact enterprise must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 946 (2009). Proving "the existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" Id. at 947 (quoting Turkette, 452 U.S. at 583).

In the present case, Moore avers that Defendant IAG is a for-profit company formed and operating in Shelby County, Tennessee and that Goodfellow is its founder, principal shareholder,

and "actively controls the day to day operations of the business." (Pl.'s Compl. ¶¶ 7-8). Moore also avers that Foley is the general manager and shareholder of IAG. (Pl.'s Compl. ¶ 9). This, Moore has plead that IAG is a legal entity, and Goodfellow and Foley have official responsibilities as shareholders and managers of the entity. Moore alleges sufficient information that there is some minimal organizational structure at IAG, including management, principals, and shareholders, such that there is factual support that IAG is a continuing unit. Id. Finally, Moore avers that the existence of the used car dealership itself, which is at its core operating for selling vehicles, is distinct from the alleged pattern of racketeering activity, which allegedly involves the illegal schemes to defraud desperate and financially strained individuals. Accordingly, the Court recommends that the specificity of Moore's allegations regarding the existence of an enterprise satisfies Rule 12(b)(6).

### 3. *Pattern of Racketeering Activity*

The third requirement in a RICO claim is a "pattern of racketeering activity that bears a sufficient nexus to the enterprise." VanDenBroeck, 210 F.3d at 699. Establishing a pattern of racketeering activity requires a showing of a minimum of two acts of racketeering activity occurring within ten years of one another. Vild v. Visconsi, 956 F.2d 560, 565 (6th Cir. 1992). The Supreme Court has determined that "[i]n addition to proving the requisite of two predicate acts, a plaintiff must show both a 'relationship between the predicates' and the 'threat of continuing activity.'" Vild, 956 F.2d at 565-66 (quoting H.J. Inc., 109 S.Ct. at 2900). "Continuity and relationship constitute two analytically distinct prongs of the pattern requirement." Id. at 566.

The required continuity can be "closed-ended," which refers to a "closed period of repeated conduct extending over a substantial period of time," or it can be "open-ended," which

refs to past conduct "which by its nature projects into the future with a threat of repetition." Vemco, Inc. v. Camardella, 23 F.3d 129, 133-34 (6th Cir. 1994) (quoting H.J. Inc., 492 U.S. at 241-42). Establishing a threat of ongoing repetition "may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." H.J. Inc., 492 U.S. at 242. In order to establish "relatedness" under a RICO claim, the alleged predicate acts must have "the same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events." Id. at 133 (quoting Vild, 956 F.2d at 566).

Moore's Complaint has alleged several acts of racketeering activity that occurred within ten years of one another. Moore has alleged that Defendants intentionally engage in false and misleading advertising, intentionally engage in misleading acts and omissions in sales and service, impose unfavorable lending terms, and require large down payments for typically unreliable vehicles. (Pl.'s Compl. ¶¶ 37, 40-42). Moore has alleged that the Defendants engaged in an open-ended scheme to defraud her, beginning with her first visit to IAG on or about September 4, 2010.

Moore has alleged one fraudulent scheme that the Defendants participated in. While one scheme does not prevent the finding of a pattern of continuing activity, the presence of only one scheme is an important factor when examining the presence of continuity. Vemco, Inc., 23 F.3d 129 at 134 (citing U.S. Textiles, Inc. v. Anheuser Busch Cos., Inc., 911 F.2d 1261, 1269 (7th Cir. 1990)). In Vemco, Inc., the court considered a case involving one victim alleging one fraudulent scheme that took place over a seventeen month period. Id. The court held that this did not constitute the type of conduct Congress attempted to prohibit with RICO. Id. The Supreme Court has held that continuity may be demonstrated by "proving a series of related predicates

extending over a substantial period of time." <u>H.J. Inc.</u>, 492 U.S. at 242. Additionally, Defendants have pointed out several cases from other circuits in which periods of time less than twelve months were insufficient to establish continuity. However, while Moore's allegations of fraud only take place over a six month time span (September 2010 to February 2011), she argues that continuity is established because the Defendants' fraudulent scheme is their regular way of doing business. By pleading that this behavior is the Defendants' regular way of doing business, Moore has satisfied the continuity requirement. <u>See</u> <u>H.J. Inc.</u>, 492 U.S. at 242. Moore has plead the "relatedness" element by detailing a scheme comprised of predicate acts that have the same purpose (deprive buyers of their vehicles so the Defendants can resell them and require large down payments), the same participants (the Defendants), the same victims (poor and working class African-Americans in the Memphis area), and the same methods of communication (allegedly misleading advertisements). Accordingly, the Court recommends that the specificity of Moore's allegations regarding the pattern of racketeering activity satisfies Rule 12(b)(6).

### 4. Proximate Cause

The final requirement in alleging a RICO violation is a showing of injury to the plaintiff as a result of the first three elements. <u>VanDenBroeck</u>, 210 F.3d at 699. The plaintiff must allege that defendant's conduct is the proximate cause of the plaintiff's injuries. <u>Holmes v. Sec. Investor Prot. Corp.</u>, 503 U.S. 258, 268 (1992). The plaintiff must also allege that the predicate acts were the "substantial and foreseeable cause of the injuries alleged." <u>Brown v. Cassens Transp. Co.</u>, 546 F.3d 347, 357 (6th Cir. 2008). Additionally, "the scheme to defraud must be targeted at the plaintiff and involve fraudulent misrepresentations made to the plaintiff." <u>Star Waste Services, LLC v. U.S. Waste</u>, LLC, No. 1:07-CV-127, 2008 WL 2066442, at *3 (E.D. Tenn. 2008).

Moore has specifically described her injuries as a result of the Defendants' alleged actions. Moore paid $1520 for a down payment on a vehicle she was told required a $1000 down payment, she made a total of $2270 in payments for a vehicle that became inoperable approximately two months after she purchased it, the Defendants did not repair the vehicle, and the vehicle was eventually set to be sold at a public sale. (Pl.'s Compl. ¶¶ 28, 29, 33, 36). In determining whether this loss was foreseeable, Moore has alleged that the repossession of the vehicle was part of the Defendants' scheme, making the final result foreseeable. (Pl.'s Compl. ¶37). Thus, the Court recommends that Moore's allegations regarding proximate causation satisfies Rule 12(b)(6). Ultimately, the Court recommends that Moore has sufficiently plead each of the required elements in a RICO claim and recommends that the Defendants' Motion to Dismiss this claim pursuant to Rule 12(b)(6) should be denied.

### B. The Truth in Lending Act and Regulation Z

TILA "was enacted to promote the informed use of credit by consumers by requiring meaningful disclosure of credit terms." Begala v. PNC Bank, Ohio, Nat. Ass'n, 163 F.3d 948, 950 (6th Cir. 1998). If a creditor "fails to disclose any of the credit terms required under the TILA and its regulations, a consumer may bring a civil action against the creditor." Purtle v. Eldridge Auto Sales, Inc., 91 F.3d 797, 800 (6th Cir. 1996). These required disclosures include the amount financed, the principal loan amount, other amounts financed, the APR, the total of payments, and the total sale price. 12 C.F.R. § 226.18. TILA claims "should be given a broad, liberal construction in favor of the consumer." Begala, 163 F.3d at 950 (citing Jones v. The TransOhio Sav. Ass'n, 747 F.2d 1037, 1040 (6th Cir. 1984)). The disclosed APR in a consumer credit transaction is accurate if the disclosed rate is "not greater than one-eighth of 1 per centum

more or less than the actual rate or rounded to the nearest one-fourth of 1 per centum." 15 U.S.C.A. § 1606(c).

Moore alleges that the Defendants intentionally failed to provide mandatory TILA disclosures as well as the actual down payment and deferred down payment by purposely misdirecting her attention. (Pl.'s Compl. ¶ 53a). The APR disclosed on the sales contract between Moore and IAG is listed as 26.000%. Moore alleges that the actual APR is 27.961%, which is more than the one-eighth of 1 per centum as permitted by statute. (Pl.'s Compl. ¶ 53b). Accepting these allegations as true, Moore has stated claims of violations of TILA.

Defendants contend that Moore's claim should be dismissed for failure to attach a copy of the sales agreement to the Complaint; however, the Federal Rules of Civil Procedure do not require Moore to attach a copy of the sales agreement to her Complaint. Additionally, Moore attached a copy of the sales agreement to her Response in Opposition to Defendants' Motion to Dismiss. Furthermore, Moore claims that the Defendants retained a copy of the sales agreement the day Moore signed it, permitting the Defendants to review the sales agreement if necessary. (Pl.'s Compl. ¶ 23).

While Moore has generally pled the appropriate requirements for a TILA claim, she has failed to assert how Goodfellow, individually as a defendant, was involved in the violations of the TILA. Moore's Complaint alleges that she did not interact with Goodfellow until two days after she signed the sales agreement. (Pl.'s Compl. ¶ 27). There is no indication of any TILA violations involving Goodfellow individually. Accordingly, the Court recommends that the TILA claims against Goodfellow individually should be dismissed pursuant to Rule 12(b)(6) but that the claims against IAG should not be dismissed pursuant to Rule 12(b)(6).

**C. Negligent Misrepresentation**

In order to establish a claim of negligent misrepresentation, the plaintiff must show as follows:

(1) the defendant is acting in the course of his business, profession or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and (2) the defendant supplies faulty information meant to guide others in their business transaction; and (3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relies upon the information.

Ritter v. Custom Chemicides, Inc., 912 S.W.2d 128, 130 (Tenn. 1995) (quoting John Martin Co., Inc. v. Morse/Diesel, Inc., 819 S.W.2d 428, 431 (Tenn. 1991)). In proving justifiable reliance, the burden is on the plaintiff "to show that its reliance upon any statements defendants may have made was reasonable." Id. at 409 (citing Metropolitan Government of Nashville and Davidson County v. McKinney, 852 S.W.2d 233 (Tenn. Ct. App. 1992)).

Factors for the court to use in considering a plaintiff's justifiable reliance include "(1) the plaintiff's business expertise and sophistication; (2) the existence of a longstanding business or personal relationship between the parties; (3) the availability of relevant information; (4) the existence of a fiduciary relationship; (5) the concealment of fraud; (6) the opportunity to discover fraud; (7) which party initiated the transaction; and (8) the specificity of the misrepresentation." Riddle v. Lowe's Home Centers, Inc. 802 F.Supp.2d  900, 908 (M.D. Tenn. 2011) (citing Goodall v. Akers, 2009 WL 528784, *6 (Tenn. Ct. App. 2009)).

Moore has made several allegations of Defendants' negligent misrepresentation in the course of selling her a vehicle.  Moore's allegations include as follows: the use of misleading television, radio, and internet ads featuring Goodfellow's trademarked phrase, "I Don't Care About Your Credit. I Care About You"; violation of 16 C.F.R. § 455.2 because the vehicle Moore purchased, along with many other vehicles on the IAG lot, did not have a Buyer's Guide

on display; bait-and-switch tactics to obtain a higher down-payment from Moore in the sales contract; misdirection of Moore's attention away from the mandatory truth-in-lending disclosures and other lines in the sales contract regarding the actual down payment and deferred down payment; concealment of the actual down payment by misrepresenting the amount to Moore and later claiming that the higher amount shown on the contract was due to sales tax; and, promising to make repairs to her vehicle after towing it to the IAG lot but never performing the repairs. (Pl.'s Compl. ¶¶ 69a-f).

Upon review, Moore has alleged the first element of negligent misrepresentation by averring that the communications between Moore and Defendants took place as part of the Defendants' course of business – selling used vehicles. Moore has also sufficiently plead the second element because she has alleged that the Defendants intentionally told her that the down payment on the vehicle she purchased was $800 and then later told her that the down payment was $1000. (Pl.'s Compl. ¶¶ 17, 18). The conduct of the Defendants led Moore to believe that she was financing the portion of the $1000 down payment that she could not afford the day she purchased the vehicle; however, Moore was actually charged $1520 for the down payment. (Pl.'s Compl. ¶ 25). These allegations together satisfy the requirement that the Defendants provided faulty information to Moore meant to guide her in the purchase of the car.

Moore alleges that Defendants did not exercise reasonable care in obtaining and communicating the above described information to her, the third element of the John Martin test, although she does not expressly identify how the lack of reasonable care took place. However, based on other portions of the Complaint, there is no indication that the Defendants ever explained to Moore that the down payment was actually $1520. Additionally, taking Moore's allegations as true, the Defendants intentionally drew her attention away from the portion of the

sales contract containing the down payment, deferred down payment, APR, and total sales price, again leading Moore to believe that she was only paying $1000 for the down payment, hiding the true amount of the down payment.  (Pl.'s Compl. ¶ 20).

In order to satisfy the final element of the <u>John Martin</u> test, Moore has alleged that she "justifiably relied on the above-described false information supplied by Defendants."  (Pl.'s Compl. ¶ 71). Again, Moore has failed to provide further information with this allegation concerning how her reliance was justified.  Considering the factors set forth in <u>Riddle</u>, Moore's reliance may be justified.  It does not appear as though Moore had any expertise in the purchase of used vehicles.  Rather, it appears as though Moore went to IAG with a set amount of money she could spend and left it to the Defendants to find a suitable vehicle for her needs.  There is no indication of a previous business or personal relationship between the parties.

Despite her lack of experience, the accurate amount of the down payment was on the sales agreement Moore signed.  Even if Defendants drew Moore's attention away from the portions of the agreement containing the accurate prices, Moore had the ability to read over those portions of the contract, as she did the following morning, in order to discover the correct prices. This information was not hidden away, impossible for Moore to discover.  It was simply on a portion of the sales agreement that was overlooked.  Even though the contract contained certain information, Moore also asserts that she relied on the verbal information provided by Defendants to sign the contract, and it is possible that a reasonable jury would find that Moore's failure to read the entire document was reasonable given the circumstances. (Pl.'s Compl. ¶ 22). Accordingly, the Court recommends that Moore's Complaint has satisfactorily plead each of the elements of negligent misrepresentation and recommends Defendants' Motion to Dismiss this claim should be denied.

### D. Conspiracy

Finally, Defendants' move to dismiss Moore's "claim for common law conspiracy" pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Defendants argue that this claim is included in Count III of Moore's Complaint, and they further assert that Moore specifically alleges that Defendants conspired "to obtain money from Plaintiffs" in Paragraphs 55-56.

Upon review of Moore's Complaint, it initially states that her action for damages arises out of various claims, including "fraud, negligent misrepresentation, breach of contract and *conspiracy to commit some or all of the aforementioned torts*." (Pl.'s Compl. ¶1). However, the remainder of Moore's Complaint does not mention any conspiracy or, contrary to Defendants' assertions, any alleged aim of obtaining money from her, including in Paragraphs 55-56. Further, in Moore's Response to the instant Motion, Moore clarifies that she does not "actually claim 'common law conspiracy.'" (Pl.'s Resp. at 17).

It appears to the Court that Moore's reference to conspiracy in the Complaint was either inadvertent or, in any event, not intended to state a claim for conspiracy. As Moore likewise does not make any allegations of conspiracy and agrees that she does not seek to pursue a claim for conspiracy, the Court recommends that IAG and Goodfellow's Motion to Dismiss any claims of conspiracy be granted.

### E. Jurisdiction

Finally, IAG and Goodfellow argue that Moore's Complaint should be dismissed pursuant to Rule 12(b)(1) because this Court does not have proper subject matter jurisdiction. While the Court would normally address any jurisdictional challenges as a threshold matter, IAG and Goodfellow argue specifically that the Court lacks federal question jurisdiction over the

RICO and TILA claims because Moore's Complaint failed to state claims upon which relief may be granted pursuant to Rule 12(b)(6). The Court has recommended that Moore's Complaint does not fail to state these federal statutory claims. Accordingly, the Court recommends that the Court has proper federal question jurisdiction over the RICO and TILA claims.

IAG and Goodfellow further argued that, if the Court did not have federal question jurisdiction over the RICO and TILA claims, it had no basis for exercising supplemental jurisdiction over the state law claims. However, the Court has recommended that the Court does have federal jurisdiction over the RICO and TILA claims. Under 28 U.S.C. § 1367(a), a federal court has supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). IAG and Goodfellow do not raise any argument that the state law claims do not form part of the same case or controversy for purposes of supplemental jurisdiction, and Moore does not address this requirement. However, the Court recommends that the state law claims regarding IAG and Goodfellow's advertising to the general public and conduct regarding the transactions with Moore are part of the same case and controversy appropriate for the Court to exercise supplemental jurisdiction.

### V. Conclusion

For the reasons set forth herein, the Court RECOMMENDS Goodfellow and IAG's Motion to Dismiss be GRANTED in part and DENIED in part. The Court RECOMMENDS that jurisdiction is proper, that Moore's RICO claim should not be dismissed as to IAG and Goodfellow, that Moore's TILA claim should not be dismissed as to IAG but should be dismissed as to Goodfellow in his individual capacity, that Moore's claim for negligent

misrepresentation should not be dismissed as to IAG and Goodfellow, and that Moore's purported claim for conspiracy should be dismissed as to IAG and Goodfellow.

**IT IS SO ORDERED** this 30th day of August, 2012.

s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**