AhahaIN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| VALERIE MOORE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 11-2758-STA-cgc |
| | ) | |
| IT'S ALL GOOD AUTO SALES, INC. | ) | |
| and MARK GOODFELLOW, | ) | |
| individually and d/b/a IT'S ALL GOOD | ) | |
| AUTO SALES, INC., and JIMMY | ) | |
| FOLEY, individually and as an agent of | ) | |
| IT'S ALL GOOD AUTO SALES, INC., | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND OVERRULING DEFENDANTS' OBJECTIONS

Before the Court is the Report and Recommendation of Defendants' (sic) Mark Goodfellow and It's All Good Auto Sales, Inc's Motion to Dismiss (D.E. #19) entered by United States Magistrate Judge Charmiane G. Claxton on August 30, 2012. Also before the Court is Defendants' (sic) Mark Goodfellow and It's All Good Auto Sales, Inc.'s Objections to the Report and Recommendations Denying Motion to Dismiss (D.E. #20), timely filed on September 12, 2012. For the reasons stated below, the Report and Recommendation is hereby **ADOPTED** and Defendants' Objections to same are **OVERRULED**.

## BACKGROUND

I.      **Procedural Background**

Plaintiff Valerie Moore ("Moore" or "Plaintiff") filed a Complaint (D.E. #1) on

September 2, 2011, alleging violations of the Racketeer Influenced Corrupt Organizations Act,

18 U.S.C. § 1961, *et seq.* ("RICO"); the Truth in Lending Act, 15 U.S.C. § 1601, *et

seq.* ("TILA") and Federal Reserve Regulation Z ("Reg Z") (implementing TILA), 12 C.F.R. §

226; the Tennessee Consumer Protection Act, T.C.A. § 47-18-101, *et seq.* ("TCPA"), the

Tennessee Uniform Commercial Code ("UCC"); and common law causes of action for fraud,

negligent misrepresentation, and breach of contract.  Defendants Mark Goodfellow

("Goodfellow") and It's All Good Auto Sales, Inc. ("IAG") filed a Motion to Dismiss (D.E. # 11)

on November 9, 2011, stating that Plaintiff failed to state a claim upon which relief could be

granted and that this Court lacked jurisdiction to hear Plaintiff's claims.  The Court Referred this

Motion to Dismiss to Magistrate Judge Charmiane G. Claxton (D.E. #17) on June 1, 2012.  The

Magistrate Judge entered a Report and Recommendation regarding this Motion to Dismiss on

August 30, 2012.

## II.      Plaintiff's Allegations of Fact

For the purposes of the instant Report and Recommendation, the Court accepts the

following facts as true:[1]

Moore is a 51 year old African American Woman residing in Shelby County, Tennessee.

(Compl. ¶ 11).  On or about September 4, 2010, Moore visited IAG to shop for a vehicle.

(Compl. ¶ 12, 13).  Moore visited IAG because it is a "major used-car dealer in Memphis,"

because of its convenient location, and because of "numerous" advertisements in various media,

including television, radio, and internet.  (Compl. ¶ 14).  These advertisements included a

---

[1]*See Nietzke v. Williams*, 490 U.S. 319, 326-27 (1989) (When reviewing a motion to
dismiss under Rule 12(b)(6), a court will accept all well-pleaded facts in the complaint as true
and construe them in the light most favorable to the plaintiff.)

statement by Goodfellow that "I Don't Care About Your Credit. I Care About You." *Id*.

Upon arrival at IAG, Moore saw a number of used luxury and sports cars parked towards the front of the lot, all of which appeared to be in good condition. (Compl. ¶ 15). A "few" of the cars had prices marked, but the rest did not have a price tag or any other notices in their windows. *Id*. A salesman greeted Moore, and inquired how much she had for a down payment. Moore informed him she had "$600 in her pocket for the down payment." (Compl. ¶ 16). The salesman proceeded to show Moore several cars, including a 1994 Toyota Camry. (Compl. ¶ 17). The salesman did not permit Moore to test drive the Camry on the road, but only in the lot. *Id*. The salesman told Moore that she would need a down payment of $800 to purchase the Camry, at which point Moore reiterated she only had $600. *Id*.

During the discussion of the down payment for the Camry, Defendant Jimmy Foley ("Foley") introduced himself to Moore. (Compl. ¶ 18). Foley informed Moore that the down payment for the Camry would be $1000. *Id*. Moore once again stated she only had $600. Foley told her "We can work something out with you, we can work something out." *Id*.

Moore completed a form with some personal information and Foley produced a contract for sale for the Camry. (Compl. ¶ 19). Foley drew Moore's attention away from certain numbers, such as the cash down payment, the deferred down payment, annual percentage rate ("APR") and other disclosures mandated by TILA and towards a series of other numbers – the "quickpay." (Compl. ¶ 20). Foley described three "quickpays," without defining the term "quickpay." *Id*. Moore understood the "quickpays" to be her down payment of $1000 for the Camry. (Compl. ¶ 22). After signing the contract and visiting her newborn great-granddaughter in the hospital, Moore took a closer look at the contract's terms. (Compl. ¶ 24). From the face of

the contract, it appeared that the total down payment was $1520, not the $1000 discussed with Foley. *Id*.

Moore returned to IAG the next morning as soon as the dealership opened. (Compl. ¶ 25). Moore asked Foley why the down payment was $1520 instead of $1000. *Id*. Foley stated the $520 was sales tax. *Id*. Moore inquired why IAG had charged her twice for sales tax, indicating that line 7 of the sales contract showed a charge of $518.20 for sales tax. *Id*. Foley then discussed "quickpay" without defining the term, failing to answer Moore's questions. *Id*.

Moore returned to IAG on September 6th to speak to Goodfellow. (Compl. ¶ 27). Moore told Goodfellow about the discrepancy in her down payment, and also informed him that the car had begun to make a "knocking" sound. *Id*. Moore asked for a refund, a request Goodfellow refused. *Id*. Goodfellow told Moore that if she did not want the vehicle any longer, she could leave it on the lot. *Id*. The Court infers that this was so Goodfellow could resell the vehicle and apply the sales price to the balance of the sales contract. Although Moore "believed she had been cheated," she chose to keep the vehicle because she did not want to lose the $650 down payment she had already made. (Compl. ¶ 28). Moore made timely payments on the "quickpays" in the amount of $870 and three regular payments of $250. *Id*. All told, Moore paid $2270 to IAG towards the purchase of the Camry. *Id*.

After the September 6th visit to IAG, Moore continued to have problems with the car. *Id*. IAG agreed to repair the vehicle in exchange for adding the cost of repairs to the amount of the sales contract. *Id*. Despite these repairs, the Camry continued to have problems and sometime in November 2010, the car suffered a complete breakdown. (Compl. ¶ 29). Three mechanics were unable to get the Camry to start. (Compl. ¶ 30). Moore contacted Goodfellow to tell him the

vehicle was inoperable.  (Compl. ¶ 31).  Goodfellow told her to "fix the car."  *Id*.  Moore

informed him she could not afford to do so.  *Id*.  Goodfellow then asked her to bring the car to

IAG, which Moore stated she could not do as it was inoperable.  *Id*.  Goodfellow suggested that

Moore have the vehicle towed, which Moore said she could not afford.  *Id*.  Finally, Goodfellow

offered to send his own tow truck, which Moore accepted.  *Id*.  The tow truck picked up the

Camry later that day.  *Id*.

Moore then called Goodfellow to find out when her car would be ready.  (Compl. ¶ 32).

Goodfellow replied that he did not know, because he had hundreds of other cars to get ready for

"tax time."  *Id*.  Moore determined from this conversation that Goodfellow and IAG had no

intention of making repairs anytime soon.  (Compl. ¶ 33).  Believing she had been "lied to during

and after the sale of the car," Moore contacted an attorney, who drafted a recission letter.

(Compl. ¶¶ 33-34).  When Moore visited IAG to deliver the recission letter and collect her

belongings from the Camry, she found the Camry in a "remote lot-nowhere near the dealership's

repair shop." (Compl. ¶ 35).  From this, she deduced that IAG had no intention of repairing the

vehicle.  *Id*.  In February, Moore received notice that IAG would sell the Camry in a public sale.

(Compl. ¶ 36).

## **STANDARD OF REVIEW**

The Court has authority pursuant to 28 U.S.C. § 636(b)(1)(C) to review *de novo* any

portions of a Magistrate Judge's report to which objections are made.[2]  Furthermore, the Court

---

[2]*United States v. Worley*, 193 F.3d 380, 383 (6th Cir. 1999).

must review all issues raised by Plaintiff's objections.[3]

A motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)") challenges a complaint for failure to state a claim upon which relief may be granted. This motion only tests whether the plaintiff has pleaded a cognizable claim.[4] A motion under Rule 12(b)(6) allows a court to dismiss meritless claims which would otherwise waste judicial resources on the basis of a dispositive issue of law.[5] In determining whether it should grant a motion to dismiss under Rule 12(b)(6), the court must examine the complaint to determine whether the complaint contains a short and plain statement of the claim showing the plaintiff is entitled to relief.[6] The court must also examine the complaint to determine whether the defendant has provided fair notice of what the plaintiff's claim is and the grounds upon which it rests.[7] While a complaint need not present detailed factual allegations, to be cognizable it must provide more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not suffice.[8] The complaint must give a factual foundation, and the mere possibility that a plaintiff might later establish some set of undisclosed facts to support recovery

---

[3]*United States v. Shami*, 754 F.2d 670, 672 (6th Cir. 1985) (citing *United States v. Raddatz*, 447 U.S. 667, 675-76 (1980)).

[4]*Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988).

[5]*See, e.g., Nietzke v. Williams*, 490 U.S. 319, 326-27 (1989).

[6]Fed. R. Civ. P. 8(a)(2).

[7]*Conley v. Gibson*, 355 U.S. 41, 47 (1957); *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir. 1976).

[8]*Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 555 (2007).

is insufficient to survive a 12(b)(6) challenge.[9]  The facts, as pleaded, must be enough to raise a right to relief above the speculative level.[10]  The complaint must contain sufficient factual matters to state a claim that is plausible on its face.[11]

When reviewing a complaint pursuant to a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff.[12]  The court need not accept legal conclusions or unwarranted factual inferences.[13]  When a complaint does adequately state a plausible claim for relief, the court may not dismiss it based on an assessment that the party will "fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder."[14]

Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") states a heightened pleading standard when a complaint alleges fraud. "[A] party must state with particularity the circumstances constituting fraud or mistake."[16] Courts in the Sixth Circuit read this rule liberally, requiring a plaintiff to, at a minimum, "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the

---

[9]*Id*. at 561.

[10]*Id.* at 555.

[11]*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[12]*Nietzke*, 490 U.S. at 326-27; *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983).

[13]*Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 405-06 (6th Cir. 1998).

[14]*Twombley*, 550 U.S. at 564, fn 8.

[16]Fed. R. Civ. P. 9(b).

injury resulting from the fraud."[17]

**ANALYSIS**

Defendants raise two major objections to the Magistrate Judge's Report and Recommendation. The first objection is that the Magistrate Judge improperly recommended the Court deny Defendant's Motion to Dismiss as to the RICO charges.[18] The second objection is that the Magistrate Judge failed to dismiss the negligent misrepresentation claim as against Goodfellow.[19] The Court will address these objections in turn.

**I.      The Magistrage Judge correctly recommended denial of Defendants' Motion to Dismiss as to the RICO Act .**

RICO prohibits a person "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce" from conducting "such enterprise's affairs through a pattern of racketeering activity[.]"[20] The purpose of RICO is to combat "organized and/or continuing patterns of criminal activity,"[21] and the statute should be liberally read to effectuate this purpose.[22] To establish a RICO violation, a plaintiff must show: 1) two or more predicate offenses; 2) the existence of an enterprise; 3) a pattern of racketeering activity that

---

[17]*Advocacy Org. for Patients and Providers v. Auto Club Ass'n*, 176 F.3d 315, 322 (1999) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993)).

[18]Defs' Obj. Rep. & Rec. at 1-2.

[19]*Id*. at 2.

[20]18 U.S.C. § 1962(c) (1988).

[21]*United States v. Qaoud*, 777 F.2d 1105, 1115 (6th Cir. 1985).

[22]*Id*.

bears a sufficient nexus to the enterprise; and 4) an injury to the plaintiff's business or property as a result of the first three elements.[23]

A.     **The Magistrate Judge correctly recommended denial of Defendants' Motion to Dismiss with respect to the heightened pleading standards of Rule 9(b) and the allegation of wire fraud as a predicate offense.**

Wire fraud is a predicate act for purposes of RICO liability.[24] Wire fraud is defined as the transmission by means of wire, radio, or television communication in interstate commerce any writings, signs, signals, pictures or sounds for the purpose of executing a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.[25] In other words, an allegation of wire fraud require a showing of "(1) a scheme to defraud, and (2) use . . . of an interstate electronic communication . . . in furtherance of the scheme."[26] In establishing a scheme to defraud by wire, wire communication must "be employed 'for the purpose of executing such scheme or artifice.'"[27]

With respect to predicate offenses of fraud, these claims must be pleaded with particularity.[28] The Sixth Circuit holds that "the plaintiffs, at a minimum, must allege the time,

---

[23]*VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 699. (6th Cir. 2000).

[24]18 U.S.C. § 1961(1) (2006).

[25]18 U.S.C. § 1343 (2008).

[26]*Advocacy Org. For Patients and Providers*, 176 F. 3d at 322 (citing *United States v. Brown*

[27]*United States v. Daniel*, 329 F.3d 480, 489 (6th Cir. 2003) (quoting 18 U.S.C. § 1343).

[28]Rule 9(b).

9

place, and content of the alleged misrepresentation on which they relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."[29] Further,

> [w]hen pleading predicate acts of mail or wire fraud, in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.[30]

The Court finds that, under this standard, Moore properly pleaded the elements of the predicate RICO offense of wire fraud. Moore alleged several instances of fraudulent statements by Defendants: the salesman's statement that the down payment for the Camry would be $800,[31] Foley's statement that the down payment for the Camry would be $1000,[32] Moore's statements that the "quickpay" total included sales tax,[33] and Goodfellow's statements that he would repair the Camry.[34] Further, Plaintiff clearly identifies the speaker in each instance, where and when the statements were made, and explains why the statements were fraudulent.

Defendants contend that the various advertisements featuring Goodfellow and his trademarked phrase "I Don't Care About Your Credit, I Care About You" cannot be considered

---

[29]*Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (citing *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993))) (internal quotations omitted).

[30]*Heinrich*, 668 F.3d at 404-05 (citing *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (quoting *Gupta v. Terra Nitrogen Corp.*, 10 F.Supp.2d 879, 883 (N.D.Ohio 1998))).

[31]Compl. ¶ 17.

[32]Compl. ¶ 18.

[33]Compl. ¶ 25.

[34]Compl. ¶ 32, 33.

fraudulent so as to constitute an element of wire fraud as a predicate offense under RICO.[35] Defendants contend that these advertisements were mere puffery, and that a reasonable person could not rely on them.[36]  However, the Court does not read 18 U.S.C. § 1343 to require that the use of interstate electronic communication itself be fraudulent in order to make out a claim for wire fraud; rather, as the plain language of the statute suggests, there must simply be use of interstate electronic communication in *furtherance* of a fraudulent scheme.

Defendants correctly note that "[m]ere use of the wires does not make an alleged fraud subject to RICO jurisdiction."[37]  However, as the *Vild* panel went on to discuss, the use of interstate electronic communication in that case was "mere happenstance"[38] and "unrelated to the other alleged conduct committed against ultimate consumers."[39]  In the instant case, Moore alleges that IAG's use of interstate electronic communication is vital to their fraudulent scheme, and describes how the nature and timing of the advertising is designed to entice poor African Americans into the dealership.[40]  The Court finds that these allegations make the use of interstate electronic communications into more than the mere happenstance contemplated by the *Vild* panel.

As such, Defendants' Objections to the Magistrate Judge's Report and Recommendation

---

[35] Defs.' Obj. At 4.

[36] *Id.*

[37] *Id.*, quoting *Vild v. Visconti*, 956 F.2d 560, 567 (6th Cir. 1992).

[38] *Vild*, 956 F.2d at 568.

[39] *Id.*

[40] Compl. ¶¶ 42, 45.

as to denial of Defendants' Motion to Dismiss under the heightened pleading standards of Rule 9(b) are **OVERRULED**.

**B.     The Magistrate Judge correctly recommended the Court find a RICO Enterprise.**

Defendants' next contention is that the Magistrate Judge failed to address the longevity requirement for a RICO enterprise.

For the purpose of RICO liability, an enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct."[41]  An "'enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[42]  To establish an association-in-fact enterprise, a plaintiff must show "1) that the associated persons formed an ongoing organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity in which it engaged."[43]

To establish  that an association-in-fact operated as a "continuing unit," the plaintiff must allege "facts suggesting that the behavior of the listed entities is 'coordinated' in such a way that they function as a 'continuing unit.'"[44]  "All that is required is some minimal level of organizational structure between the entities involved."[45]  An association-in-fact enterprise must

---

[41]*United States v. Turkette*, 452 U.S. 576, 580 (1981).

[42]18 U.S.C. § 1961(4) (2006).

[43]*VanDenBroeck*, 210 F.3d at 699.

[44]*Begala v. PNC Bank, Ohio, Nat. Ass'n*, 214 F.3d 776, 782 (6th Cir. 2000) (citing *Frank v. D'Ambrosi*, 4 F.3d 1378, 1386 (6th Cir. 1993)).

[45]*VanDenBroeck*, 210 F.3d at 699.

have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."[46] Proving "the existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'"[47]

Although Moore's pleadings indicate that IAG is an association-in-fact,[48] the Court finds that the allegations in the Complaint sufficiently set forth that IAG is a legal entity organized under the laws of the State of Tennessee.[49] The Complaint further avers that Goodfellow is the founder and principal shareholder of IAG, and actively controls the day to day operation of the business.[50] The Complaint goes on to state that Foley is the general manager and a shareholder of IAG, and is actively involved in the day to day operations of the business.[51] As IAG meets the definition of an enterprise under the plain language of 18 U.S.C. 1961(4), the Court finds it unnecessary to analyze whether IAG is an association-in-fact.

Defendants' Objection to the Magistrate Judge's determination that IAG was a RICO enterprise is bottomed on an assertion the Magistrate Judge failed to consider the longevity requirement of an association-in-fact. Since the Court finds that IAG is an association *de*

---

[46] *Boyle v. United States*, 556 U.S. 938, 946 (2009).

[47] *Id*. at 947 (quoting *Turkette*, 452 U.S. at 583).

[48] Compl. ¶ 43, 44.

[49] Compl. ¶ 7.

[50] Compl. ¶ 8.

[51] Compl. ¶ 9.

*jure* instead of an association-in-fact, this Objection is **OVERRULED** as moot.[52]

**C.      The Magistrate Judge correctly recommended the Court find a pattern of racketeering activity.**

To establish a pattern of racketeering activity, a plaintiff must show a minimum of two acts of racketeering activity within ten years of each other.[53]  The plaintiff must show both a relationship between the predicate acts and a threat of continuing activity.[54]  These two requirements, continuity and relationship, are analytically distinct prongs of the pattern requirement under RICO.[55]

Continuity may be either closed-ended or open-ended.[56]  Closed-ended continuity refers to a "closed period of repeated conduct extending over a substantial period of time."[52]  Open-ended continuity refers to past conduct "which by its nature projects into the future with a threat of repetition."[53]  A plaintiff may establish a threat of repetition "by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business."[54]  A plaintiff may establish relatedness by showing the predicate acts have "the same or similar purposes, results,

---

[52]Defs' Obj. At 5.

[53]*Vild*, 956 F.2d at 565.

[54]*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989).

[55]*Vild*, 956 F.2d at 566.

[56]*Vemco, Inc. v. Camardella*, 23 F.3d 129, 133-134 (6th Cir. 1994).

[52]*Id.*

[53]*Id.*

[54]*H.J. Inc.* 492 U.S. at 241-42.

participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events."[55]

The Court finds that Plaintiff sufficiently alleges at least two acts of racketeering activity occurring within ten years of each other. Plaintiff alleges that Defendants' use of interstate electronic communications to further a fraudulent scheme constitutes wire fraud as a predicate act to RICO liability.[56] Drawing all reasonable inferences in Plaintiff's favor, the Court finds that the pervasive advertising by Defendant that Plaintiff alleges[57] would not be targeted towards just one victim. Further, Plaintiff alleges multiple fraudulent activities facilitated by the use of interstate electronic communication, including a "bait and switch"-type fraud in the negotiation of down payments[58] and fraud as to the nature and reliability of vehicles sold.[59] Again, drawing all reasonable inferences in Plaintiff's favor and taking Plaintiff's factual allegations as true, the Court finds that Defendant would have practiced the alleged scheme more than once in ten years.

Likewise, the Court finds that Plaintiff sufficiently alleges an open-ended threat of continuing activity. Plaintiffs allege that the RICO predicate act of wire fraud is Defendants' regular way of doing business.[60] While the pleading standards of Fed. R. Civ. P. 8 require more

---

[55]*Id.* at 133 (quoting *Vild*, 956 F.2d at 566).

[56]Compl. ¶ 40.

[57]Compl. ¶¶ 14, 45.

[58]Compl. ¶¶ 47-49.

[59]Compl. ¶ 51.

[60]Compl. ¶¶ 46-51.

than labels, conclusions, or formulaic recitations of the elements of a cause of action,[61] this standard does not force the plaintiff's well-pleaded facts to be persuasive as well as plausible.[62] While Plaintiff may not have made her case on the pleadings alone, the Court finds it at least plausible, taking Plaintiff's allegations of fact as true, that Defendants' regular way of doing business includes the described fraudulent activity.

Defendants argue that Plaintiff's factual allegations relate only to one scheme, the alleged scheme to defraud Moore.[63] Defendants further argue that the alleged scheme to defraud Moore only took place over a six-month time period.[64] Defendants rely on the Sixth Circuit's opinion in *Vemco, Inc. v. Camardella*[65] to assert that allegations of single instance of fraud, while not dispositive to the issue of continuity, is relevant to the inquiry.[66] The *Vemco* panel went on to discuss that a single instance of fraud against a single plaintiff over the course of seventeen months did not satisfy the continuity requirement under RICO.[67] However, as Plaintiff points out, the plaintiff in *Vemco* did not allege that the alleged predicate acts were part of the defendant's regular way of doing business.[68] Further, the Court notes that Plaintiff alleges "year

---

[61]*Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[62]*Mediacom Se. LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 400 (6th Cir. 2012).

[63]Defs.' Obj. at 6.

[64]*Id.*

[65]23 F.3d 129 (6th Cir. 1994).

[66]Defs'. Obj. at 6, citing *Vemco*, 23 F.3d at 134.

[67]*Id.*

[68]Pls'. Resp. at 8, citing *Vemco*, 23 F.3d at 135.

16

round" use of interstate electronic communication, and that Defendants intensify their advertising at the beginning of the year.[69]  Taking Plaintiff's allegations as true and drawing reasonable inferences in Plaintiff's favor, the Court finds that these allegations give rise to an inference of annual intensification of advertising in furtherance of the alleged fraudulent scheme, necessarily implying that the alleged fraudulent scheme lasted more than six months.  Further, the Court finds it implausible that such repeated advertising would target a single person of modest means; rather, it is plausible to assume that if such advertising were in furtherance of an alleged fraudulent scheme, the scheme was meant to defraud multiple parties.

As Plaintiff properly pleaded sufficient facts to establish the pattern requirement for RICO liability, Defendants' Objections to the Magistrate Judge's Recommendations on this point are **OVERRULED**.

**D.    Defendants do not object to the Magistrate Judge's recommendations regarding proximate cause.**

As Defendants make no objection to the Magistrate Judge's Recommendation regarding the proximate cause requirement for RICO liability, the Court hereby **ACCEPTS** the Magistrate Judge's Recommendation as to this requirement.

**II.    <u>The Magistrate Judge correctly recommended the Court deny Defendants' Motion to Dismiss with respect to Moore's claim for negligent misrepresentation as against Goodfellow.</u>**

"A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity

---

[69]Compl. ¶ 45.

jurisdiction.'"[70] A District Court sitting in diversity must apply the law of the state in which it

sits.[71] Thus, the Court will apply Tennessee substantive law to Plaintiff's negligent

misrepresentation claims.

The Tennessee Supreme Court adopts the formulation of the Restatement (Second) of

Torts § 552 for negligent misrepresentation claims.[72]  Section 552 states that the tort of negligent

misrepresentation requires:

> (1) One who, in the course of his business, profession or employment, or in any
> other transaction in which he has a pecuniary interest, supplies false information
> for the guidance of others in their business transactions, is subject to liability for
> pecuniary loss caused to them by their justifiable reliance upon the information, if
> he fails to exercise reasonable care or competence in obtaining or communicating
> the information.
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is
> limited to loss suffered
> > (a) by the person or one of a limited group of persons for whose benefit
> > and guidance he intends to supply the information or knows that the
> > recipient intends to supply it; and
> > (b) through reliance upon it in a transaction that he intends the information
> > to influence or knows that the recipient so intends or in a substantially
> > similar transaction.
> (3) The liability of one who is under a public duty to give the information extends
> to loss suffered by any of the class of persons for whose benefit the duty is
> created, in any of the transactions in which it is intended to protect them.[72]

Explaining this standard as applied to parties not in contractual privity, the Tennessee Supreme

Court articulated four elements to negligent misrepresentation:

> (1) the defendant is acting in the course of his business, profession or

---

[70]*Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999).

[71]*Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

[72]*Ritter v. Custom Chemicids, Inc.*, 912 S.W.2d 128, 130 (Tenn. 1995).

[72]Restatement (Second) of Torts § 552 (1977)

employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; *and*

(2) the defendant supplies faulty information meant to guide others in their business transaction; *and*

(3) the defendant fails to exercise reasonable care in obtaining or communicating the information; *and*

(4) the plaintiff justifiably relies upon the information.[73]

**A.** **Defendants make no objection to the Magistrate Judge's Recommendations with respect to whether Moore sufficiently alleged that Goodfellow was acting in the course of his business, profession or employment, or in a transaction in which he has a pecuniary interest; whether Goodfellow failed to exercise reasonable care in obtaining or communicating information; or whether Moore justifiably relied upon the information.**

Seeing no objections to the Magistrate Judge's Recommendations with respect to whether Plaintiff properly pleaded these issues, the Magistrate Judge's Recommendations as to these issues are hereby **ADOPTED**.

**B.** **The Magistrate Judge properly recommended that Moore pleaded sufficient facts to allege Goodfellow supplied faulty information to Moore.**

Defendants' sole objection on the question of whether Plaintiff properly pleaded sufficient facts as to the claim of negligent misrepresentation is bottomed on the assertion that Plaintiff failed to allege Goodfellow ever supplied faulty information to Moore.[74]  Defendants further state the "only factual allegations regarding [Moore]'s dealings with [Goodfellow] are

---

[73]*Id*. (quoting *John Martin Co. Inc. v. Morse/Diesel, Inc.*, 819 S..2d 428, 431 (Tenn. 1991)).

[74]Defs.' Obj. at 8.

found in paragraphs 27 and 31-33 of the Complaint."[75]  Defendant asserts that since the

Magistrate Judge found that Goodfellow was not involved in negotiation of the sales contract

with Moore, the negligent misrepresentation claim should be dismissed.[76]

It is true that the Plaintiff does not allege Goodfellow was involved in the direct

negotiation of the sales contract with Moore.[77]  As such, the Magistrate Judge properly

recommended that the TILA claims against Goodfellow be dismissed.[78]  However, Plaintiff

alleges more dealings with Goodfellow than simply the negotiation of a sales contract.

First, Plaintiff alleges that the depiction of Goodfellow in advertising along with his

trademarked phrase "I don't care about your credit, I care about you" was the type of faulty

information which could give rise to a claim for negligent misrepresentation.[76]  Tennessee courts

define "puffing" as "loose general statements made by sellers in commending their products.

These statements embody exaggerations, the truth or falsity of which cannot be determined

easily, that amount to no more than the seller's opinion[.]"[77]  Under Tennessee law, courts are

> generally . . . cautious about a seller's claim that its representations were mere
> puffing.  Thus, the question of whether a particular statement amounts to an
> actionable misrepresentation will generally be left to the jury whenever
> circumstances indicate that the buyer reasonably understood that he or she was

---

[75]*Id.*

[76]*Id.*

[77]M.J.'s Rep't. & Rec. at 15.

[78]*Id.*

[76]Compl. ¶¶ 14, 37

[77]*Ladd by Ladd v. Honda Motor Co., Ltd.*, 939 S.W.2d 83, 100 (Tenn. Ct. App. 1996).

receiving something in the way of an assurance as to specific facts.[78]

The Court is unwilling, at this stage of the litigation, to declare Goodfellow's trademarked phrase mere puffery on which Moore could not have relied as a matter of law. While it may be exceedingly difficult for Plaintiff to prove whether Goodfellow cared about her or not, or whether his actions indicated such, at this stage in the pleadings the Court may not weigh the evidence.[79] Rather, the Court's inquiry is to determine whether there is any set of facts in support of Plaintiff's claim that would entitle her to relief.[80]

Second, Plaintiff specifically asserts that all defendants, Goodfellow included, failed to display required FTC disclosures on vehicles owned for sale by IAG.[81] Goodfellow was under a duty imposed by law to furnish required FTC disclosures.[80] As noted above, under Tennessee law, a legal duty to provide information can lead to liability under a theory of negligent misrepresentation to all persons in the protected class.[81] Seeing that Goodfellow had a legal duty to provide the disclosures mandated by federal regulation, the Court finds that Moore sufficiently pleads facts giving rise to a plausible inference that Goodfellow's alleged failure constituted faulty information.

---

[78]*Id.*

[79]*Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995) (citing *Cameron v. Seitz*, 38 F.3d 264, 270 (6th Cir. 1994).

[80]*Miller*, 50 F.3d at 377 (citing *Cameron*, 38 F.3d at 270 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957))).

[81]*Id.* ¶ 32.

[80]*See* 16 CFR § 455.2.

[81]*Ritter*, 912 S.W.2d at 130.

Finally, Plaintiff alleges a conversation between herself and Goodfellow in which she tells him that her car is inoperable and he directs her to bring the vehicle to the dealership.[82] The Court finds that this conversation could be found by a jury to reasonably be understood by Moore to mean that Goodfellow was to fix the automobile, particularly in light of the alleged past dealings between the parties (i.e. the multiple previous repairs Plaintiff alleges.)[83] Moore further alleges that she discovered the vehicle in a lot far away from the repair shop, approximately two months after she had left it in Goodfellow's care.[84] The Court finds that these facts together, taken as true, lead to a reasonable inference in favor of Plaintiff that Goodfellow misrepresented whether he would fix Moore's vehicle.

Since Plaintiff pleads sufficient facts to show Goodfellow might be held liable on a theory of negligent misrepresentation, Defendants' Objections are hereby **OVERRULED.**

<u>CONCLUSION</u>

As discussed above, the Court finds that the Magistrate Judge properly recommended that Plaintiff's claims for violations of RICO not be dismissed. Further, the Court finds that the Magistrate Judge properly recommended that Plaintiff's claim against Goodfellow for negligent misrepresentation not be dismissed. The Court notes no other objections before it, and any further exceptions to the Magistrate's Report and Recommendation would be untimely.[85] As

---

[82]Compl. ¶

[83]Compl. ¶¶ 28-29

[84]Compl. ¶ 35.

[85]*See* Fed. R. Civ. P. 72(b)(2) (party objecting to Magistrate Judge's Report and Recommendations must object within fourteen days).

such, the Magistrate Judge's Report and Recommendation is hereby **ADOPTED** and

Defendants' Objections hare hereby **OVERRULED**.

       **IT IS SO ORDERED.**


         **s/ S. Thomas Anderson**
         S. THOMAS ANDERSON
         UNITED STATES DISTRICT JUDGE

         Date:   September 30, 2012.